IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JOSE A. GARCIA,

        Plaintiff,

vs.                                                    Case No. 08-4153-SAC

CARGILL, INC.,

        Defendant.

MEMORANDUM AND ORDER

This employment discrimination case comes before the court on defendant's motion for summary judgment. Plaintiff alleges that defendant discriminated against him in his terms and conditions of employment and terminated him, based upon his Mexican origin or ancestry. Defendant contends that it terminated the plaintiff for his repeated and serious safety violations, and that its acts during the plaintiff's employment were unrelated to the plaintiff's national origin or ancestry.

**Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec.*

*Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential

inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether the evidence is so one-sided that one party must

prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). However, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.' " *Matsushita*, 475 U.S. at 587. *See Pinkerton v. Colorado Dept. of Transp.*, 563

F.3d 1052, 1058 (10th Cir. 2009).

**Facts**

The following facts are uncontroverted and are construed in the light most

favorable to plaintiff.[1] The defendant hired the plaintiff on August 31, 1998, to work as a

laborer at its AgHorizons grain elevator on Gordon Street in Topeka. As a new hire, the

plaintiff participated in an orientation process that included extensive safety training.

The Gordon Street facility conducted safety meetings on a weekly or biweekly basis, as

well as daily meetings where safety issues were often discussed. Often, the plaintiff

signed in but did not stay for the safety meetings because he was needed to work in the

tunnel. One of the topics covered at the safety meetings was defendant's

"lockout/tagout" policy, which precludes employees from working on or inspecting any

equipment unless the equipment is turned off, locked in the "power off" position, and

affixed with a tag describing the work being done.

_____

[1]The Court does not consider facts which are unsupported by the record.

The plaintiff received annual raises and worked at the Gordon Street facility without incident for several years. In 2004, the plaintiff filed a discrimination charge against the defendant which the EEOC later dismissed pursuant to a non-monetary settlement in which defendant agreed to provide certain training to the plaintiff. In turn, the plaintiff released any and all claims against the defendant arising prior to October 6, 2004. Four months after that settlement, the defendant promoted the plaintiff from a laborer to an operator.

Plaintiff's first relevant safety violation occurred on April 20, 2006, when he attempted to cross over a moving conveyor belt in the galley area, at a place not designated as a crossover. The plaintiff admits that he had reviewed a safety manual expressly advising employees to "cross belt conveyors only on crossovers provided for that purpose." The plaintiff, although aware of that restriction, sought to take a "short cut" by stepping over the belt or on the conveyor's belt cover, but slipped and injured his back. After the incident, two of defendant's managers expressly told the plaintiff that it was inappropriate to step on the "removable belt cover," and a production supervisor reminded all employees that "crossing belts at points other than those specifically designed for it is unacceptable." The plaintiff received a verbal warning, but no written warning about this incident. He was told and understood that his acts constituted a safety violation and that continued safety performance failures could result in disciplinary action up to and including termination.

Two months later, the plaintiff received his annual performance evaluation for the year immediately preceding June 1, 2006. The plaintiff's overall rating for this yearly review was "MS," an abbreviation which is not defined in the record or described by the

parties, but which is evidently lower than "meets expectations," and higher than "below expectations." The evaluation reflects that the plaintiff did not "exceed expectations" in any of the six categories, but "met expectations" in four categories, was "below expectations" in the category of demonstrating "respect, candor and commitment," and was ranked "MS" in the category of "ensuring and accepting accountability." Dk. 52-14, p.1. The comments to the latter ranking state:

> Had a documented safety violation that he tried to justify rather than admit fault to. Also had attendance problems that provide a negative image to other employees.

Dk. 52-14, p. 2. The "safety violation" alluded to is plaintiff's April 20, 2006 crossing of the belt, discussed above.

Plaintiff's second safety violation occurred on January 15, 2007, in the tunnel area, which had no crossovers. Unlike the galley area, the tunnel area has, in some places, dust hoods, which are flat covers placed over the large conveyor belts which carry grain. The plaintiff admits that on January 15, 2007, he was standing on the dust hood over a moving conveyor belt, loosening the grain. The plaintiff asserts that he was trained to do so, and that due to his "stature," he could not physically perform his duties without doing so. Employees in the tunnel are required to lift a heavy metal slide and to open and close valves located above the hopper belts five or five-and-one-half-feet high. Employees were not told they should turn off the belt before loosening the grain.

The plaintiff's conduct, witnessed by several persons, was reported to Operations Leader Troy Anderson, who sent the plaintiff home pending an investigation. In a meeting with Anderson and others the next morning, the plaintiff admitted that he had been standing on the dust hood over a moving belt, but claimed he had to do so to do

his job. Defendant suspended the plaintiff's employment pending further investigation.

Anderson later successfully recommended plaintiff's termination due to plaintiff's

repeated safety violations. The written notice of termination, dated January 16, 2007,

but given to the plaintiff on January 19, 2007, states:

> On Monday January 15, 2007 you were suspended without pay pending
> investigation regarding your violation of our established and communicated
> safety policies & procedures. You had a previously documented safety policy &
> procedure violation on 4/20/06.
> These repeated safety violations are unacceptable. As a result, you are
> terminated from employment at Cargill, Incorporated effective today, January 16,
> 2007.
> ....

Dk. 43, Exh. 5.

This suit is brought pursuant to Title VII, 42 U.S.C. § 1981, and the Kansas Act

Against Discrimination (KAAD). Additional facts will be addressed throughout this order.

**Termination**

The court first addresses plaintiff's contention that his termination was based

upon his national origin. Section 1981, Title VII and the KAAD make it unlawful for an

employer to discriminate against any individual with respect to terms, conditions or

privileges of employment based on the individual's national origin or ancestry.[2] *See* 42

U.S.C. § 2000e-2(a)(1); 42 U.S.C. §1981; K.S.A. § 44-1009(a)(1); *Hysten v. Burlington*

*N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002). The court applies the

same standards and burdens to plaintiff's claims under Title VII, § 1981, and the KAAD,

---

[2]The Court will use the term "national origin" in lieu of ancestry for purposes of
convenience, recognizing that Section 1981 the plaintiff's claim of discrimination based
on his Mexican ancestry falls within section 1981's protection against racial
discrimination. *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 n. 10 (10th Cir. 1997).

and examines the same elements. *See Carney v. City and County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

Because the plaintiff offers no direct evidence of national origin discrimination, the court evaluates his claim under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of discriminatory discharge based on national origin, "the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (quotation omitted). If the plaintiff meets his burden of proving a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quotation omitted).

Defendant first contends that the plaintiff was not qualified for his position because he was not doing satisfactory work, as evidence by his two safety violations within nine months. The court believes that defendant reads the qualification element too broadly, improperly incorporating into the prima facie case the analytically subsequent inquiry regarding the its justification for the adverse action and the plaintiff's opposing demonstration of pretext. Based on the plaintiff's length of tenure in his position and his latest performance evaluation, the court finds that the plaintiff was minimally qualified for his position, as required for a prima facie case.

Defendant additionally contends that there is no causal nexus between anti-

6

Mexican statements and the decision to terminate the plaintiff. This, too, is an issue better addressed in analyzing pretext, as the cases cited by the defendant illustrate. *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006); *Escalante v. IBP, Inc.*, 199 F.Supp.2d 1093 (D.Kan. 2002).

The court finds that the plaintiff has established a prima facie case of national origin discrimination. *See Bolton v. Sprint/United Management Co.*, 220 F. App'x 761, 766-67 (10th Cir. 2007). The burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the  plaintiff's termination. *Orr v. City of Albuquerque*, 531 F.3d 1210 (10th Cir. 2008). That burden is not onerous. *See Anaeme v. Diagnostek, Inc.*,164 F.3d 1275, 1279 (10th Cir.1999) (recognizing employer's burden is "exceedingly light"), *cert. denied*, 528 U.S. 814 (1999). Defendant has met this burden by providing some evidence that the plaintiff committed two serious safety violations within a year, warranting termination. That rationale is supported by sufficient documentation in the record to shift the burden back to the plaintiff to show a genuine dispute of material fact as to whether defendant's asserted reason for termination is pretextual.

Plaintiff must show evidence from which a reasonable jury could conclude that the defendant's proffered non-discriminatory reasons for its actions are a pretext for intentional discrimination on the basis of national origin. *See Texas Dept. of Community. Affairs v. Burdine*, 450 U.S. 248, 255 & n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1163 (10th Cir. 2007) (Plaintiffs must come forward with "evidence of differential treatment sufficient to permit an inference that the true explanation ... was intentional discrimination."); *Miller v. Eby*

*Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005) ("[T]he factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions-simply disbelieving the employer is insufficient.")

Pretext may be shown in a variety of ways,"including but not limited to differential treatment of similarly situated employees and procedural irregularities." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008). *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff."

*Kendrick v. Penske Transportation Services*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted). In assessing the question of pretext, the court views the facts, and all the reasonable inferences the facts entail, in the light most favorable to the plaintiff as the summary judgment respondent. *Orr*, 531 F.3d at 1215.

The plaintiff first attempts to show pretext by providing evidence of anti-Mexican statements made to him by co-employees and supervisors. Defendant counters that no causal nexus is shown between those statements and the termination decision because the record shows no discriminatory remarks made by or reported to Anderson, the decision-maker.

The court agrees that the record shows no discriminatory remarks made by or reported to Anderson and that Anderson was the decision-maker, thus the plaintiff's evidence of anti-Mexican animosity is insufficient to demonstrate pretext. The record does show, if the plaintiff's testimony is credited, that co-employees and supervisors other than Anderson engaged in anti-Mexican acts or statements. For example, supervisor Josh Perry laughed at plaintiff's complaints about his treatment; a few weeks before the plaintiff's termination said he was going to kick plaintiff's "Mexican behind"; and another time stated that one Mexican more or less doesn't matter. Supervisor Ryan Goldie made disparaging comments in December of 2006 about the plaintiff's food.

The record shows that both of these persons had the title of supervisor and had the authority to discipline the plaintiff. Nonetheless, the plaintiff must a demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate him. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir.1994). Plaintiff has not pointed to any evidence in the record suggesting that Perry's or Goldie's or some other subordinate's alleged animus affected Anderson's review and termination. Plaintiff does not articulate, for example, a subordinate bias or cat's paw theory of liability. *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1060 -1061 (10th Cir. 2009). Under that theory,

> an employer can be held liable for a subordinate employee's prejudice even if the decision-maker lacked the required intent where the decision-maker failed to independently investigate the subordinate's complaint against the former employee and instead merely followed the biased recommendation of the subordinate. *See English v. Colo. Dept. of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001).

*Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006).

Even had the plaintiff raised this theory, the court would find that Anderson's request that the plaintiff give his side of the story before Anderson investigated and recommended termination, is sufficient to defeat any inference that the decision was based on the bias of any subordinate, including Goldie and Perry. *See Pinkerton*, 563 F.3d at 1060; *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006); *English v. Colorado Dept. of Corrections*, 248 F.3d 1002, 1011 (10th Cir. 2001). Accordingly, the anti-Mexican statements do not tend to show a pretextual termination decision.

Plaintiff makes three other succinct arguments in support of his claim of pretext: 1) that plaintiff was treated differently than a non-Mexican comparator; 2) that plaintiff identified and reported many other safety violations by non-Mexican employees that were ignored; and 3) that the plaintiff was trained to be on the hood in the tunnel and his supervisors in the tunnel permitted him to be on the hood after his first safety violation in the galley area in 2006. *See* Dk. 52, p. 25. These latter two attempt to show the falsity of the defendant's stated reason for the termination.

The court first addresses the plaintiff's claim that he was treated differently than his non-Mexican comparator, Michael Moe. To show pretext by this theory of disparate treatment, the plaintiff must show that he was treated differently from similarly-situated employees outside the protected class who committed comparably serious acts. *See Kendrick*, 220 F.3d at 1232; *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997). "A court should also

compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu*, 112 F.3d at 1404. The record shows that Moe was employed at the same facility as was the plaintiff, and that his safety-related incidents occurred in generally the same time span as did the plaintiff's (the eight months immediately before and after the plaintiff's termination). It is thus reasonable to infer that the same safety policies applied to him and the plaintiff. The record also shows that Moe was disciplined by the same supervisor (Ryan Goldie) who was involved in the plaintiff's discipline. The Court thus finds the plaintiff and Moe to be similarly situated for purposes of this motion.

Defendant does assert, however, that Moe's conduct was not as serious as was the plaintiff's. The burden is on the plaintiff to show the similarity between his conduct and that of his comparator. *See Whalen v. United Air Lines, Inc.*, 972 F.2d 357, 1992 WL 180124, 2 (10th Cir.1992) (Table). "[E]mployees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) "... [T]he comparison need not be based on identical violations of identical work rules; however, the violations must be of comparable seriousness. *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995)." *English*, 248 F.3d at 1011.

In making this determination, the court should consider "the differences in the nature of each incident, the conduct of each combatant, and their disparate personnel histories." *Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 298 (6th Cir. 1988).

In determining whether offenses are of comparable seriousness, it is

important "to compare only discipline imposed for like offenses in sorting out claims of disparate discipline ... [while balancing] the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same circumstances." *Id.* "[T]he 'comparison can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender."' *Moore v. City of Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985) (quoting *Solem v. Helm*, 463 U.S. 277 (1983)).

*Lewis v. Virginia Baptist Homes, Inc.*, 1997 WL 102524, 2 (W.D.Va.1997).

"The determination that two acts are of comparable seriousness requires-in addition to an examination of the acts-an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Thus where evidence is shown of defendant's ranking of offenses, or of a progressive disciplinary policy, the court will initially defer to that assessment. *See Trujillo v. Huerfano County Bd. of County Com'rs*, 349 Fed.Appx. 355, 366 (10th Cir. 2009) (finding "no evidence to suggest that defendants considered any of these single accidents to be as serious as multiple safety violations...") *See e.g. Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 301 (6th Cir. 1988) ("a principled determination of "comparable seriousness" require[s] at least initial deference to the system of offenses created by the [defendant].); *Bartee v. Morris*,149 F.3d 1167,1998 WL 252738, 3 (4th Cir.1998) (Table) (it is appropriate to give "at least initial deference to the system of offenses created by the [employer].") But the ultimate determination of comparable seriousness is a question of fact. *See e.g., English v. Colorado Dept. of Corrections*, 248 F.3d 1002 (10th Cir. 2001) (finding the act of kissing an inmate "does not seem of comparable seriousness to multiple acts of sexual intercourse between a prison employee and an inmate"); *Kendrick,* 220 F.3d at 1232 (finding the act of verbally abusing a supervisor was less serious than verbally abusing and pushing a supervisor).

Here, the record includes neither the defendant's disciplinary policy nor any general classification or ranking of the seriousness of safety violations, nor any other evidence to reflect how the defendant usually evaluated the seriousness of various safety violations.

The defendant contends that plaintiff's two safety violations were more serious than Moe's seven or more safety violations. The record reveals the following regarding the nature of Moe's offenses and the weight that his supervisors attributed to them at the time of the violations. Two written "Employee Warning Notices" were issued by defendant to Moe. The first states that on December 4, 2006, Moe sat on the belt then slid down onto the rail, which was a violation of safety policy. That written warning, signed by supervisors Goldie and Emch, stated he would be suspended if the incident occurred again. *Id.* It also noted a prior safety violation on September 19, 2006. Dk. 52, Exh. 11. The record shows that on September 19, 2006, Perry wrote Moe up for "not wearing side shields on his glasses and told him that further issues regarding performance of safety could result in disciplinary action up to and including termination." Dk. 53-2, p. 2, Exh. A to Emch's affidavit. That notice was sent to Emch and Goldie.

The second written warning issued by defendant to Moe is dated May 24, 2007. It reflects that on May 23rd and 24th, Moe used a fall protection harness to load rail cars but failed to fill out the fall protection inspection form. That warning, signed by supervisors Emch and Goldie, additionally lists two previous warnings: 1) the December 4th incident noted above; and, 2) a safety violation on September 8, 2006. It states:

> Michael has a continued pattern of violating safety policies and
> procedures. This continued lack of execution is un-acceptable (sic). Over the
> past 30 days, Michael has had 2 other safety related incidents (failure to wear

goggles while blowing down and failure to remove a lock on equipment).

Dk. 52, Exh. 12. These latter two "other safety related incidents" in April or May of 2007 are thus in addition to Moe's safety violations on September 8, 2006, September 19, 2006, December 4, 2006, May 23, 2007, and May 24, 2007. The May 24th written warning reflects that Moe was suspended for three days, and states: "Future safety violations of any sort will result in termination due to past patterns." *Id.*

Defendant dismisses Moe's safety violations on May 23 and 24th (failing to fill out the fall protection inspection form), as mere paperwork omissions which are not serious in nature. But the record may mean that Moe not only failed to fill out the inspection paperwork, but also may have failed to inspect the fall protection harness, which could have serious consequences to himself and others, should the harness fail. Defendant also shows that Moe's safety violation on December 4, 2006, was to sit on a belt that was not moving, and argues that plaintiff's two violations, which occurred over moving belts, were more serious. The court might agree, were those the only safety violations to be compared, but the court must consider the entire record and cannot ignore or discount Moe's other safety violations when determining comparable seriousness. Moe's failure to wear goggles or side shields would appear to endanger himself, and perhaps others. His failure to remove a lock on equipment, if the equipment were to start operating while locked, could seriously endanger himself and others. The plaintiff received only one verbal warning about his violation of a safety policy before being terminated, while Moe received two written warnings and a three day-suspension, yet was not terminated despite his known "continued pattern of violating safety policies and procedures." The record thus tends to support the plaintiff's claim that the plaintiff may

14

have been treated differently from a similarly-situated non-Mexican employee who engaged in comparably serious violations.

The record does not support, however, the plaintiff's general assertion that he reported many other safety violations by non-Mexican employees that defendant ignored. *See* Dk. 52, p. 16, and record cited therein. Defendant disputes the general assertion that reported safety violations routinely went unpunished, by affidavits from supervisors Kauk, Anderson, and Perry. *See* Dk. 43, Kauk affidavit, para. 10; Dk. 43, Anderson affidavit, para. 10; Dk. 43, Joshua Perry affidavit, para.10. The record does support, however, the plaintiff's assertions that on unstated dates he reported two[3] safety incidents to his supervisors. First, the plaintiff reported to Jim Caldwell that Darel Ralls started the distributor while the plaintiff was cleaning. *See* Garcia Tr. p. 90, 91. In response, defendant shows the court that Jim Calwell (erroneously stated by the plaintiff to be Jim Caldwell) has not worked for the defendant since March 1, 2004. Dk. 53, Exh.1. Thus, this event necessarily predates the plaintiff's release of any and all claims against the defendant arising prior to October 6, 2004, so is not actionable here. Secondly, the plaintiff reported to "his supervisor" (unnamed) that Dereck threw a chemical compound in his face and eyes. *See* Garcia Tr. p. 90, 91. The record fails to provide Dereck's last name, a date or other context of the incident, the name of the supervisor to whom the plaintiff reported the occurrence, or evidence supporting the plaintiff's assertion that the defendant ignored his complaint, rendering this claim fatally

---

[3]Plaintiff contends that he reported another problem with a dry bearing, but his deposition page cited in support of this assertion (Tr. p. 92) is not included in the record. This is but one example of facts asserted by the plaintiff which are unsupported by the record.

non-specific.

Plaintiff next challenges the veracity of the reason for his termination, contending that his supervisors trained and permitted him to be on the hood in the tunnel after his first safety violation in the galley area in 2006. Plaintiff testified that John Kauk said: "in the tunnel it was okay to be on the hood, but not in the galley." Garcia Tr. p. 49-51. Plaintiff additionally testified that co-employees stood on the hood in the tunnel all the time, and that his own supervisors, "Kevin Gatzemeyer, Jim Calwell, Lenny Sanders," and another supervisor whose name he could not remember, taught him to stand on the hood in the tunnel to lift the lid or to open the valves. *Id.*, p. 22.

Defendant does not offer refutation by any of these named supervisors, but contends that most of the "warnings" regarding the plaintiff's first safety incident were in writing, that they speak for themselves, and that they make no distinction between the galley area and the tunnel area. Dk. 53, p. 17. In contrast, the record shows that the only warning issued to the plaintiff regarding his first safety incident was verbal. The "warnings" cited by counsel are a first aid incident report, and an internal memo written by John Kauk, both of which apparently were issued to their respective files. Dk. 43, p. 62-64. The record does not reflect that either of these reports was ever shown to the plaintiff or otherwise constitutes a "warning" to the plaintiff. No other incident reports or written warnings relating to either of the plaintiff's safety violations are included in the record.

Additionally, the first aid incident report and the internal memo referenced by defendant fail to support defendant's suggestion that the plaintiff's offense in the galley area was identical to his offense in the tunnel area. Defendant equates the references

16

to the "removable belt cover" which the plaintiff stepped on in the galley area to the dust hood which the plaintiff stood on in the tunnel. But the record, read in the light most favorable to the plaintiff, shows that there are no dust hoods in the galley area:

Q. Is there a difference between the conveyor area in the tunnel and the galley?

A. Yes.

Q. What's the difference primarily?

A. Primarily the tunnel – tunnels have this dust hood along them and the galleys do not.

Grandstaff depo., p. 27. Defendant presents no evidence in support of its assertion that the removable belt cover in the galley area is comparable to the dust hood in the tunnel area.

Defendant offers affidavits to refute the plaintiff's assertions that he was trained to stand on the hood, to the following effect: that employees are never permitted or required to stand on the hood over a moving conveyor belt; that they had never seen an employee stand on a hood over a moving belt; that they never trained Garcia to stand on the hood over a moving conveyor belt; and, that standing on top of the hood over a moving conveyor belt is a "clear and major" violation of Cargill's lockout/tagout policy. *See* Dk. 53, p. 7-8, paras 10, 14-16, and record cited therein. None of these affidavits, however, is from a supervisor alleged by the plaintiff to have expressly permitted him to be on the dust hood, so these do not directly contradict the plaintiff's testimony but instead challenge his credibility.

More importantly, the record fails to show that the defendant honestly believed that the plaintiff had violated the lockout/tagout policy at the time it terminated the

plaintiff. The affidavit by Anderson, the decision-maker, does not aver such belief. No evidence reveals any reference to that policy during the investigation immediately preceding the plaintiff's termination, and no reference to it is made in the written notice of termination Anderson gave to the plaintiff. Nor does the record show that the defendant believed that the plaintiff's safety violations were "serious." Instead, the reason given to the plaintiff at the time of termination was simply that he had engaged in "repeated safety violations." Yet Moe had many more safety violations than the plaintiff and was not terminated. That the defendant's proffered reason for termination was generated only after the termination is a factor long held significant in assessing claims of pretext. *See Plotke v. White*, 405 F.3d 1092,1103-08 (10th Cir. 2005).

Additionally, the court has reviewed the defendant's lockout/tagout policy, and it does not clearly prohibit the acts admittedly engaged in by the plaintiff. It does not state that employees cannot stand on the hood when the conveyor belt is moving, or that they must turn the power off on the conveyor before standing on the hood. Dk. 43, p. 44.[4] In fact, the policy makes no express reference to any hood or conveyor belt. Its relevant language states:

> The person performing the work or inspection of the equipment shall lock the power controls in the off position. All potential energy sources shall be isolated, locked or tagged out, or otherwise disabled when unexpected start-up or release of stored energy could occur and cause injury or other losses.
> ....

Dk. 52, Exh. 4.

The plaintiff understood that the lockout/tagout policy was to be followed when

---

[4]No reference to defendant's "lockout/tagout" policy was made in the first aid incident report regarding the April 20, 2006 safety violation.

cleaning out the boot and when any maintenance was performed on the conveyor belt, neither of which was being done on the date of his second safety violation. The lockout/tagout policy repeatedly refers to the "work or inspection" of the equipment, and expressly contemplates that outside contractors may work on the equipment. The policy does not state any triggering event for application of the policy, but it appears to apply only when one is performing maintenance on or inspection of equipment. This is confirmed, in part, by the deposition of Mr. Grandstaff, who stated that it is permissible to stand on the dust hood in the tunnel to perform maintenance, if the conveyor belt is properly locked out and not running. In short, it is not clear from the plain language of the policy that the plaintiff's act of standing on the hood over a moving conveyor belt in the tunnel violated the lockout/tagout policy.

Defendant submits various affidavits which summarily conclude that the plaintiff violated the policy, but none specifies which language in the policy prohibits the acts engaged in by the plaintiff; none shows that other employees who were not performing maintenance or inspection of equipment were cited for having violated this policy; and none opines that the policy is either intended to apply or actually does apply to acts other than maintenance or inspection of equipment. Two affidavits opine that "a large conveyor belt carrying tons of grain constitutes "moving equipment" subject to the lockout/tagout policy,"[5] but the policy itself does not use the phrase "moving equipment" or otherwise distinguish between moving and non-moving equipment.

Defendant also provides a copy of its Safety Handbook, but fails to show how

---

[5]Dk. 43, Emch affidavit at para. 5, Perry affidavit at para. 4.

this document supports its termination decision. Although this document includes a section on "Conveyor Safety," which has a subsection on "Belt Conveyors," none of the Handbook's language prohibits standing, sitting, or being on the hood, whether over a still or a running conveyor belt. Instead, this subsection states:

Never clean under running belt within 10' of a head or tail pulley;

Cross belt conveyors only on crossovers provided for that purpose; and

Never step onto a conveyor belt. It may start without warning.

Dk. 43, p. 53 (J). Plaintiff's conduct in crossing the belt at a place other than a crossover, which gave rise to his first verbal warning, is clearly prohibited, but defendant has failed to show that it honestly believed that the plaintiff's standing on the dust hood over a moving conveyor belt in the tunnel violated its Safety Handbook.

Defendant does not contend that plaintiff's supervisors used their discretion to cite the plaintiff for an obvious safety violation which was not specifically prohibited in their policies. Instead, defendant asserts only that the plaintiff's acts were a clear and serious violation of the lockout-tagout policy. The weaknesses noted above in this proffered reason, coupled with defendant's possibly disparate treatment of the plaintiff and Moe, create a genuine issue of material fact as to whether the defendant's articulated reason is a pretext for national origin discrimination.

The Tenth Circuit has "definitively rejected a "pretext plus" standard." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). Thus, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008); *Guyton v. Ottawa Truck*

*Div., Kalmar Industries U.S.A., Inc.*,15 Fed.Appx. 571 (10th Cir. 2001). Because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability in an employment discrimination case, the plaintiff need not always introduce additional, independent evidence of discrimination. *Reeves*, 530 U.S. at 149, 154,120 S.Ct. 2110. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117 (10th Cir. 2003); *See Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1113 -1114 (10th Cir. 2005). Whether the defendant was in fact motivated by discrimination is, of course, for the finder of fact to decide.

The court is well aware that the vast majority of the plaintiff's factual assertions are supported solely by his deposition testimony. Defendant controverts those facts and invites the court to find the plaintiff's testimony to be "disproven by all evidence other than Garcia's deposition testimony." *See e.g.*, Dk. 53, pp. 10-18. In ruling on a motion for summary judgment, however, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ..." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.[6] Although a jury may

---

[6]Because the issues of credibility and damages are not properly before the Court, the Court has given no weight to the affidavit by defendant's counsel, Andrew Tanick, Dk. 43, Exh. 11, or to its attached records from the plaintiff's mental health professionals. The court shares, however, the concerns noted by plaintiff's counsel about Mr. Tanick's becoming a witness in the case. *See Bickford v. John E. Mitchell Co.*, 595 F.2d 540, 544 (10th Cir.1979) (Attorneys appearing as witnesses on behalf of their clients have been required to withdraw as counsel to avoid ethical improprieties); Rule 226 of the Kansas Supreme Court, Kansas Rules of Professional Conduct, Rule 3.7 (Lawyer as Witness).

find that the plaintiff's testimony lacks credibility, and may fully credit the conflicting testimony of multiple witnesses offered by the defendant, the court cannot engage in that analysis on this motion. Summary judgment is not warranted on the plaintiff's claim of discriminatory termination.

**Terms and Conditions**

The plaintiff's claims of discrimination in the terms and conditions of his employment, as stated in the Pretrial Order, are:

> ... use of leave, application of company personnel policies, training, advancement, attendance and discipline policies and that he was subjected to a barrage of epithets directly related to his national origin, his ancestry, and was further denied advancement opportunities as compared to similarly situated non-Mexican employees of the Defendant.

Dk. 42, p. 4.[7]

These contentions lack specificity as to time, date, and specific position desired, failing to meet the plaintiff's burden to plead minimal factual allegations on each material element that must be proved. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The plaintiff's brief sheds little light on the matter. It is clear that the plaintiff desired a transfer to defendant's other facilities, but the plaintiff fails to show that he requested a transfer through the appropriate procedures established by the defendant; the specific date(s) on which he did so; which non-Mexican employees got the desired positions; what the qualifications were of those who received the desired positions; or, that a transfer would have significantly benefitted him. "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Adler*, 144 F.3d at 674.

---

[7]No claim of hostile work environment is made.

Plaintiff generally contends that he was entitled to unspecified promotions and transfers by virtue of his seniority. Even if the requisite specificity were present, any inference of discrimination is precluded by the Collective Bargaining Agreement, which states:

> In all cases of job assignment, promotions, transfers, reductions in force, and recalls to work the Company will give full consideration to ability and qualifications including, but not limited to, physical fitness, safety and job performance, experience, dependability including absenteeism and tardiness record, job knowledge, and skills. If ability and qualifications are sufficient and equal among competing employees, seniority prevails. Seniority will be recognized on a plant-wide basis.

Dk. 42, Exh.10, p.15, Art. XIV, §14.2. Plaintiff has failed to present any evidence showing that his ability and qualifications were "sufficient and equal" to any less senior non-Mexican employee who was promoted or transferred, such that seniority alone should have controlled.

Further, even where candidates are similarly qualified, pretext is not shown absent an overwhelming merit disparity.

> We have cautioned that "pretext cannot be shown simply by identifying minor differences between plaintiff's qualifications and those of successful applicants," but only by demonstrating an "overwhelming" merit disparity. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1319 (10th Cir. 1999), overruled on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Moreover, we acknowledge that it is not our role to "act as a super personnel department that second guesses employers' business judgments." *Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs.*,165 F.3d 1321,1329 (10th Cir. 1999).

*Santana v. City and County of Denver,* 488 F.3d 860, 865 (10th Cir. 2007). No such merit disparity has been shown.

Additionally, the substantive discrimination provisions of Title VII are limited "to [adverse] actions that affect employment or alter the conditions of the workplace."

*Piercy v. Maketa*, 480 F.3d 1192, 1203 n.12 (10th Cir. 2007), quoting *Burlington*

*Northern & Santa Fe Ry. v. Non-Mexican*, 548U.S. 53, 126 S.Ct. 2405 at 2412,165

L.Ed.2d 345 (2006).

> In analyzing whether plaintiff has suffered an adverse employment action, the court examines whether plaintiff has shown a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004). The Circuit does not consider "a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Piercy v. Makata*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).

*Velazquez v. Tyson Fresh Meats, Inc.*, 2007 WL 2994068, 6 (D.Kan. 2007).

In an attempt to show adverse employment action, the plaintiff's counsel

contends that a transfer would have entailed a raise, since the other facilities were non-

union shops. Dk. 52, p. 26. This assertion, however, is not supported by citation to the

record. The plaintiff additionally contends that a transfer would have enabled him to

escape the national origin harassment he endured at the Gordon Street facility. The

plaintiff's deposition recites numerous instances of vulgarity and insult, but fails to

establish specific dates or events at which they were made. Most of the harassment

was allegedly done by co-employee Don Holthaus, but the plaintiff fails to show the

court that he reported many of those incidents to a management-level employee or that

the defendant otherwise knew or should have known about them. *See Adler v. Wal-Mart*

*Stores, Inc.*,144 F.3d 664, 673 (10th Cir. 1998).

Some incidents, however, do involve supervisors: Josh Perry (laughed at

plaintiff's complaints about his treatment; said he was going to kick plaintiff's "Mexican

behind"; said one Mexican more or less doesn't matter); Jim Caldwell and Terry Moe

(suggested that plaintiff get in a wagon and go back to Mexico); Ryan Goldie (compared plaintiff's food to poop in December of 2006). The defendant shows that Jim Calwell and Terry Mohl (whose names are misspelled by the plaintiff) left defendant's employment before the effective date of the plaintiff's release, precluding any claims in this suit based on their conduct.[8] As to acts done by or known to supervisors other than Calwell and Mohl, the plaintiff has failed to show that the discriminatory acts occurred after the date of the release. Even had the plaintiff shown that he has not waived or released those claims and that the supervisors have sufficient authority that their knowledge may be imputed to the employer, *see Wilson v. Tulsa Junior College*,164 F.3d 534, 542 (10th Cir. 1998), the court would find the acts to be insufficiently severe or pervasive to have significantly altered the plaintiff's work environment.[9] *See Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (allegations of identifiable discriminatory or harassing conduct constitute "sporadic ... slurs" rather than a "steady barrage of opprobrious ... comments."); *Cf. Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998) (co-worker hostility or retaliatory harassment if sufficiently severe may be adverse employment action). Accordingly, the plaintiff's desired transfers would not have involved a significant change in the plaintiff's conditions of employment, and would have

---

[8]Some vagueness in a hostile work environment claim may be inconsequential since the point of such claims is that the discrimination was ongoing and pervasive and not at isolated points in time. Here, however, the lack of dates is problematic because of the 2004 release executed by the plaintiff.

[9]The Pretrial Order contains no claim of hostile work environment national origin harassment. The plaintiff raises the anti-Mexican statements only in an effort to show pretext and to show that the defendant's failure to transfer him would have constituted adverse action.

been truly lateral.

> If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.

*Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 n. 6 (10th Cir. 1998). Summary judgment is warranted on the plaintiff's claims of employment discrimination in failing to promote or transfer.

Plaintiff's claims of failure to train meet the same fate. Plaintiff contends that he was relegated to doing only cleaning tasks when doing maintenance work, but non-Mexican employees were permitted to learn "maintenance functions." Dk. 52, p. 12. Plaintiff admits, however, that he did not ask for any specific training, and the defendant shows that it does not track this kind of informal training. As to the plaintiff's claim of lack of training in the scale room, the plaintiff admits the scale room position did not provide higher pay, better hours, or benefits than the job the plaintiff had. The plaintiff further claims that he was not allowed to attend off-site grain grading training one day per year, but no showing has been made that non-Mexican employees were sent to the training. For all of the plaintiff's claims of failure to train, no showing has been made that the training would have impacted the plaintiff's job in any significant way. Thus even assuming a denial of such training, no adverse action has been shown.[10]

Plaintiff additionally contends that defendant prevented him from taking time off

---

[10]Plaintiff's counsel additionally contends that the denial of the training required by the parties' 2004 Settlement Agreement constitutes adverse action, but the Court cannot reach that issue since the 2004 Settlement Agreement is not in the record and the parties have not stipulated as to what training the agreement required.

for medical appointments, did not pay him for holidays if he called in sick the day before or after a holiday, required him to use vacation days rather than sick days when he was sick, and similar matters. Plaintiff has not shown, however, that defendant treated him any differently in these respects than it treated its non-Mexican employees, or that any of these events created a significant change in his employment status. Defendant additionally shows the court that the terms of the Collective Bargaining Agreement controlled such matters, that it was to the employee's advantage to choose to use vacation days when sick, since vacation days were paid and counted toward overtime, and that the choice to so do was the employee's and not company's. In short, the plaintiff has failed to raise a genuine issue of material fact that he was discriminated against on the basis of his Mexican origin or ancestry in any terms and conditions of his employment except his termination.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 43) is granted in part and denied in part in accordance with the terms of this memorandum and order.

Dated this 21st day of April, 2010, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge